IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION


TABITHA M. MASK                                                        PLAINTIFF

        v.                         Civil No. 08-3048

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                         DEFENDANT

## MEMORANDUM OPINION

    Plaintiff, Tabitha Mask, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) terminating her supplemental security income ("SSI") payments under Title XIV of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 416(i) and 423. In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

**Procedural Background:**

    The plaintiff's mother filed an application for SSI on her behalf on September 7, 1994. (Tr. 38, 40-42). The Commissioner determined that Plaintiff was disabled as of September 1, 1994, and eligible for SSI payments as a child, due to marked restriction in her communication skills and moderate restrictions in her cognitive abilities. (Tr. 13, 43-45, 72). When plaintiff attained the age of 18 in 2005, the Commissioner conducted a disability redetermination to determine whether Plaintiff remained eligibility under the adult disability standard. The Commissioner determined that the Plaintiff was no longer disabled as of July 1, 2005. (Tr.88-90). This determination was upheld on reconsideration. (Tr. 86-87, 91-102). An administrative

hearing was held on September 13, 2007, at which plaintiff appeared *pro se* and testified on her own behalf. (Tr. 638-660).

At the time of the administrative hearing, plaintiff was 22 years old and possessed a high school education. (Tr. 32, 646). The record reveals that she has no past relevant work experience ("PRW"). (Tr. 28, 143, 148).

On January 14, 2008, the Administrative Law Judge ("ALJ") concluded that plaintiff's mild mental retardation and communication disorder were severe but did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (Tr. 23, 27). After partially discrediting plaintiff's subjective complaints, the ALJ determined that since July 1, 2005, plaintiff has retained the residual functional capacity to perform a full range of work at all exertional levels with the following nonexertional limitations: mild limitations in the ability to understand, remember, and carry out instructions; moderate limitations with regard to interacting appropriately with supervisors, co-workers and responding appropriately to usual work changes and routine work changes; marked limitations in the ability to make judgments on simple work-related decisions and deal appropriately with the public; and, extreme limitations with regard to understanding, remembering, and carrying out complex instructions and making judgments on complex work-related decisions. (Tr. 28-29). With the assistance of a vocational expert, the ALJ then concluded that plaintiff could still perform work as a silver wrapper, a kitchen helper/dishwasher, and a laundry folder. (Tr. 31, 625).

The plaintiff appealed this decision to the Appeals Council, but her request for review was denied on July 16, 2008. (Tr. 4-7). Subsequently, plaintiff filed this action. (Doc. # 1).

This case is before the undersigned by consent of the parties. Both parties have filed appeal briefs, and the case is now ready for decision. (Doc. # 7, 8).

**Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3),

1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

**Discussion:**

Of particular concern to the undersigned is the ALJ's mental RFC assessment. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his or her RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir.2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).

Records indicate that Tabitha has suffered with severe deficiencies in cognitive development and a speech impediment since early childhood. (Tr. 125). Reports filed and submitted to the Social Security Administration by Flippin Elementary School reflect a special needs child who attended speech therapy on a daily basis. (Tr. 125-35). An elementary school teacher reported that plaintiff required about 75% more personal attention than her average students needed and that plaintiff was likely to complete assignments only with help. (Tr. 131).

4

A second teacher confirmed plaintiff's struggles with learning and speech, reporting that plaintiff had a difficult time following instructions and rules, and that she often had trouble "exhibiting appropriate behaviors when not under direct supervision one on one." (Tr. 160). Plaintiff was also said to exhibit unusually immature and childish behavior, was defiant and disobedient, failed to learn from mistakes, was physically overactive, and spoke out of turn in class on a daily basis. (Tr. 161).

In February of 1998, at the direction of the Administration, plaintiff underwent a battery of speech tests administered by a speech pathologist, Dr. Allen Hall. (Tr. 379-381). On the Test of language Development-Intermediate, her spoken language quotient, speaking quotient, and snytax quotient scores were very poor, and her listening quotient and semantics quotient scores were poor. Articulation testing showed that plaintiff consistently formed consonant-sounding substitutions and that her speech was also marked by a, "mild vocalic /r/ sound" contributing significantly to a reduction in her speech intelligibility. (Tr. 380). This placed her in the 32nd percentile for her age and sex. Dr. Hall diagnosed plaintiff with a mild phonological disorder and moderate to severe receptive and expressive language disorder. He recommended that she continue to attend speech therapy. (Tr. 380-81).

On December 9, 1998, Dr. Tammy Berke conducted an Intellectual Assessment and Evaluation of Adaptive Functioning test. (Tr. 382-386). Plaintiff had a full scale I.Q. of 65, placing her in the category of mildly mentally retarded. Further testing revealed that plaintiff, a fifth grader, was actually reading, spelling, performing mathematical computations, and screening at the level of a second grader. Dr. Berke noted that plaintiff could not communicate effectively for her age and displayed poor articulation of speech and poor knowledge of

5

vocabulary words. She also indicated that plaintiff was overweight for her age and size, weighing 130 pounds and being less than 5 feet tall. Plaintiff was also noted to have difficulty remembering things, had a short attention span, and experienced difficulty focusing on things. (Tr. 382-386).

On December 18, 2002, plaintiff was evaluated by Dr. Adam Brazas. (Tr. 447-451). He administered the same IQ test, on which plaintiff scored a full scale IQ of 52, indicating the presence of mild mental retardation. He noted a very mild speech articulation problem, but did not view it as a limitation. Dr. Brazas indicated that plaintiff gave up quickly on difficult items and displayed a somewhat low psychomotor activity level. However, plaintiff was also suffering from the flu at the time of testing, and he acknowledged that this could have impacted her performance. Dr. Brazas did observe her speech impediments but concluded that her articulation problem was hardly noticeable and did not interfere with testing. He did not administer an adaptive behavior scale, but given her IQ, concluded that she would likely have significant limitations in adaptive functioning. (Tr. 447-451). Dr. Brazas stated that plaintiff's adaptive functioning was consistent with a diagnosis of mental retardation. (Tr. 451).

On March 16, 2004, plaintiff was referred to the University of Arkansas Department of Pediatrics for a comprehensive evaluation after placement in foster care. (Tr. 469-483). PACE (Project for Adolescent and Child Evaluations) indicated that she had been placed in foster care on February 18, 2004, due to allegations of sexual abuse and neglect. However, the record contains little information regarding this issue. At this time, plaintiff was in the eleventh grade at Mountain Home High School where she was receiving special education services in all subjects. She was noted to have a history of stomach problems (vomiting and pain), pneumonia,

appendectomy at age 13, and borderline diabetes. Further, plaintiff's mother and father were both noted to have learning disabilities and mental retardation. Plaintiff interacted well with the examiners, was cooperative, attempted each task presented, was friendly and initiated conversation, and showed an appropriate pencil grasp. IQ testing revealed a full scale IQ of 74, falling within the borderline level of intellectual functioning. Her scores on the calculation test and the writing fluency test were also in the below average to low average range. Further, her achievement scores were below the level that was usually obtained by students her age with her IQ level. The Passage Comprehension Test also revealed a below average ability to read sentences and paragraphs and demonstrate understanding. Additional scores indicated that plaintiff would have difficulty constructing sentences for conversation and storytelling, with language arts activities that require grammar and syntax skills, understanding the meanings of slang and other forms of figurative expressions, and determining the meaning of a new word from the context of a sentence. Accordingly, the examiner concluded that plaintiff was suffering from a learning disorder. (Tr. 469-483).

A CASL (Comprehensive Assessment of Spoken Language) was also administered by Dr. Suzanne Miltich. (Tr. 469-483). This test measures oral language processing, oral expression and word retrieval, knowledge of use of words and grammatical structures of language, and the ability to use language in the contexts of higher-level cognitive function as well as communication. The CASL has a mean of 100 and a standard deviation of 15, meaning that scores of 85- 115 fall within the normal range. (Tr. 477). Plaintiff earned a score of only 51, placing her under the 0.1 percentile. Due to the standard error of measurement, Dr. Miltich

indicated that she was 90% confident that this plaintiff's true score fell between 47-57, indicating a Severe Receptive-Expressive Language Disorder. (Tr. 469-483).

On June 7, 2004, Dr. Robert Hudson, a clinical psychologist, by referral of the Administration, conducted an Intellectual Assessment (WAIS-III), a Wide Range Achievement Test, and an Evaluation of Adaptive Functioning test. (Tr. 484-487). He noted that plaintiff had graduated from Mountain Home High School the previous month, having attended K-12 in special education classes. IQ testing revealed a full scale IQ of 72. Dr. Hudson noted that these scores were almost 20 points higher than plaintiff's IQ scores in 2002, but also acknowledged that plaintiff was reportedly feeling ill on the day of the 2002 testing, which could have impacted her scores. Plaintiff's reading skills were found to be on the fourth grade level, her spelling skills on the fifth grade level, and her arithmetic skills on the second grade level. Her concentration was poor and her pace was slow. Dr. Hudson concluded that plaintiff's scores met the DSM-IV criteria for mild mental retardation and that all of her adaptive functions were affected. (Tr. 486). He indicated that it would be very difficult for her to remember, understand, and carry out instructions in many if not most jobs in competitive employment. However, Dr. Hudson believed she could function well in a sheltered workshop or a training environment geared to her ability level. He was of the opinion that plaintiff's disability continued. (Tr. 484-487).

On March 31, 2005, Ms. Nora Regan, plaintiff's special education teacher for her senior year of high school, indicated that plaintiff had problems with impaired articulation, language, concentrating on class work, working independently and staying on task, completing assignments on time, talking out of turn/interrupting, lying or stealing, temper outbursts, learning from mistakes, defiance/ disobedience, and childish/immature behavior. (Tr. 240-241). She reported

that plaintiff had been to detention once and suspended twice for behavior related issues. Ms. Regan noted that verbal correction was met with only fair results. (Tr. 240-241).

On March 14, 2007, Dr. Robert Hudson conducted a second Mental Diagnostic Evaluation and Intellectual Assessment of plaintiff. (Tr. 609-615). Although plaintiff had the manual to study for her drivers license exam, she had not yet done so for fear that she would not be able to pass the exam. Dr. Hudson stated that it seemed quite likely to him that she would not become a driver. IQ testing revealed a full scale IQ of 73. Plaintiff was compliant and understood directions. Persistence was not a problem. Given her history, Dr. Hudson continued her with a diagnosis of mild mental retardation. He also diagnosed her with communication disorder and assessed her with a global assessment of functioning score of 45-55. Dr. Hudson indicated that plaintiff could not write well enough for satisfactory communication and had a fifth grade spelling ability and a fourth grade reading ability. While plaintiff could be understood, she was difficult to understand due to her dysfluency. Plaintiff was noted to be slow and unable to multitask at all. Dr. Hudson opined that plaintiff could probably read well enough to read laundry marks, but little beyond that in modern society. He could find no limits on her persistence, but noted she was much more likely to stare at something too long without having good judgment on when to abandon the effort and move on. She was also easily distractible.

Dr. Hudson also completed a mental RFC assessment. (Tr. 613-615). He concluded that plaintiff had extreme limitations with regard to understanding, remembering, and carrying out complex instructions and making judgments on complex work-related decisions. She was also found to have marked limitations in the areas of making judgments on simple work-related decisions and interacting appropriately with the public. Dr. Hudson also found moderate

9

limitations with regard to plaintiff's ability to interact appropriately with supervisors and co-workers and respond appropriately to usual work situations and to changes in a routine work setting. He indicated that her IQ and inability to multitask, as well as the ridicule she would receive from others supported his conclusions. Although plaintiff seemed capable of independent living, she was not being trained for that and had plans that exceeded her grasp. He indicated that her thirteen years of schooling left her with minor literacy skills and little or no practical skills. (Tr. 613-615).

On April 25, 2008, Dr. Vann Smith conducted a neuropsychodiagnostic evaluation on Tabitha. (Tr. 629-637). His notes indicate that plaintiff presented with a history of worsening neurocognitive symptoms including: 1) impaired recall/declarative memory, 2) affective liability, 3) impaired concentration, 4) bradyphrenia, 5) impaired attention to sequential detail, 6) dysexecutivism, 7) sleep pattern disturbance and 8) word finding impairment. Her affect was muted and shallow, her mood mildly dysthymic, her native intelligence estimated to lie within the borderline range, and her thought processes concrete to functional. IQ testing revealed an IQ of 80. Dr. Smith diagnosed plaintiff with cognitive dysfunction and borderline intellectual functioning. He indicated that her pattern of abnormal responses and pathgnomonic signs observed across her neuropsychodiagnostic screening test profile was similar to that seen commonly in association with cerebrovascular toxic, hypoxic, or metabolic encephalopathies and traumatic brain insult.

Dr. Smith also completed a mental RFC assessment. (Tr. 633-637). He determined that plaintiff would be unable to meet competitive standards in the areas of remembering work-like procedures, maintaining attention for two hour segments, maintaining regular attendance and

10

**AO72A**
**(Rev. 8/82)**

punctuality, sustaining an ordinary routine without special supervision, completing a normal workday and workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, understanding, remembering, and carrying out detailed instructions, setting realistic goals or making plans independently of others, and dealing with the stress of semiskilled and skilled work. Dr. Smith also concluded that plaintiff was seriously limited but not precluded with regard to understanding and remembering very short and simple instructions, working in coordination with or proximity to others without being unduly distracted, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers or others without unduly distraction them or exhibiting behavior extremes, responding appropriately to changes in a routine work setting, dealing with normal work stress, being aware of normal hazards and taking appropriate precautions, interacting appropriately with the general public, traveling in unfamiliar places, and using public transportation. (Tr. 633-637).

In spite of this evidence, the ALJ concluded that plaintiff retained the residual functional capacity to perform a full range of work at all exertional levels with mild limitations in the ability to understand, remember, and carry out instructions; moderate limitations with regard to interacting appropriately with supervisors, co-workers and responding appropriately to usual work changes and routine work changes; marked limitations in the ability to make judgments on simple work-related decisions and deal appropriately with the public; and, extreme limitations with regard to understanding, remembering, and carrying out complex instructions and making judgments on complex work-related decisions. (Tr. 28-29).

11

We note that Dr. Hudson examined plaintiff on at least two occasions and concluded that plaintiff had severe to moderate symptoms in many categories of functioning. In 2004, he stated that it would be very difficult for plaintiff to remember, understand, and carry out instructions in many if not most jobs in competitive employment. Dr. Hudson was of the opinion that she could function well in a sheltered workshop or a training environment geared to her ability level, but believed that her disability continued. (Tr. 484-487). Further, in 2007, he stated that plaintiff was unable to multitask, had plans that exceeded her grasp, and possessed only minor literacy skills and little or no practical skills. (Tr. 614). Dr. Hudson also assessed her with a global assessment of functioning score of 45-55. A score of 41 to 50 is indicative of serious symptoms or a serious impairment in social, occupational, or school functioning while a score of 51 to 60 suggests moderate symptoms or a moderate impairment in those areas of functioning. *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS IV-TR 34 (4th ed. 2000).

Dr. Hudson's assessments seem to be in line with the majority of the medical evidence concerning plaintiff's mental impairments. He is also a psychologist, which qualifies him as both a treating source and a mental health specialist. 20 C. F. R. §§ 404.1502, 416.902 Accordingly, we find that his opinion is entitled to greater weight than was given by the ALJ. *See Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (holding that Commissioner is encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of speciality than to the opinion of a source who is not a specialist).

We also note that plaintiff attempted to work washing dishes and cleaning tables in a local fast food restaurant. She lasted only six weeks before quitting due to her inability to keep pace. A claimant's residual functional capacity should be based on their ability to perform the

12

requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir. 1982) (abrogated on other grounds). Given the fact that Dr. Hudson found plaintiff capable of only sheltered workshop type work, we cannot say that the ALJ's mental RFC assessment is supported by substantial evidence in the record. Remand is necessary to allow the ALJ to reconsider plaintiff's mental limitations.

**Conclusion:**

Accordingly, we conclude that the ALJ's decision is not supported by substantial evidence and should be reversed and remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

DATED this 5th day of January 2009.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE