IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

CRYSTAL CREAMER
o/b/o A.C.C., a minor                                                    PLAINTIFF

           v.                              Civil No. 08-3045

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                    DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Crystal Creamer, brings this action on behalf of her son, A.C.C., seeking judicial

review, pursuant to 42 U.S.C. § 405(g), of a decision of the Commissioner of the Social Security

Administration (Commissioner) denying his application for child supplemental security income (SSI)

benefits under Title XVI of the Social Security Act (the "Act").

**Procedural Background:**

Plaintiff protectively filed an application for SSI on A.C.C.'s behalf on August 13, 2004,

alleging disability due to Attention-Deficit/Hyperactivity Disorder (ADHD)[1] and Oppositional

Defiant Disorder (ODD).[2] (Tr. 98-100, 104). At the time of filing, A.C.C. was seven years old, a

school-age child under the Act. (Tr. 98). An administrative hearing was held on June 19, 2007. (Tr.

63-76). A.C.C. was present at the hearing and represented by council.

---

[1] ADHD is characterized by a "persistent pattern of inattention and/or hyperactivity/impulsivity that is more frequently displayed and more severe than is typically observed in individuals at a comparable level of development." AM. PSYCHIATRIC ASS'N. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 85 (4th ed., 2000).

[2] ODD is characterized by a "recurrent pattern of negativistic, defiant, disobedient, and hostile behavior toward authority figures" that persists for at least six months and is characterized by the frequent occurrence of at least four of the following behaviors: losing temper, arguing with adults, actively defying or refusing to comply with the requests or rules of adults, deliberately doing things that will annoy other people, blaming others for his or her own mistakes or misbehavior, being touchy or easily annoyed by others, being angry and resentful, or being spiteful or vindictive. To qualify for ODD, the behaviors must occur more frequently than is typically observed in individuals of comparable age and developmental level and must lead to significant impairment in social, academic, or occupational functioning." *Id.* at 100.

The Administrative Law Judge (ALJ), in a written decision dated January 14, 2008, found that: (1) A.C.C. is not engaged in substantial gainful activity; (2) A.C.C. suffers from ADHD and Conduct Disorder[3], both of which constitute severe impairments; (3) although A.C.C.'s impairments are severe, they do not meet or medically equal a listed impairment; and (4) A.C.C. does not have extreme or marked limitations in any domain of functioning, and as such, does not have an impairment(s) that functionally equals a listing. (Tr. 24-38). Accordingly, the ALJ concluded that A.C.C. is "not disabled" within the meaning of the Act. (Tr. 31-38).

On June 20, 2008, the Appeals Council declined to review this decision. (Tr. 15-17). On August 4, 2008, after considering newly submitted evidence, the Appeals Council again declined to reopen A.C.C.'s case, thus making the ALJ's decision the final decision of the Commissioner. (Tr. 2-3). Plaintiff now seeks judicial review of that decision.

---

[3] Conduct Disorder is characterized by a "repetitive and persistent pattern of behavior in which the basic rights of others or major age-appropriate social norms or rules are violated. These behaviors fall into four main groupings: aggressive conduct that causes or threatens physical harm to other people or animals, nonaggressive conduct that causes property loss or damage, deceitfulness, or theft, and serious violations of rules. Three (or more) characteristic behaviors must have been present during the past 12 months, with at least one behavior present in the past 6 months." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, *supra* note 1, at 94.

"Children or adolescents with this disorder often initiate aggressive behavior and react aggressively to others. They may display bullying, threatening, or intimidating behavior; initiate frequent physical fights; use a weapon that can cause serious physical harm, be physically cruel to people or animals; steal while confronting a victim; or force someone into sexual activity." *Id.*

"Although Oppositional Defiant Disorder includes some of the features observed in Conduct Disorder (e.g., disobedience and opposition to authority figures), it does not include the persistent pattern of the more serious forms of behavior in which either the basic rights of others or age-appropriate societal norms or rules are violated. When the individual's pattern of behavior meets the criteria for both Conduct Disorder and Oppositional Defiant Disorder, the diagnosis of Conduct Disorder takes precedence and Oppositional Defiant Disorder is not diagnosed." *Id.* at 98.

AO72A
(Rev. 8/82)

**Factual Background**:

**I. School Records**

A.C.C. has a history of behavioral problems at school. He was enrolled in the Head Start program at age four. (Tr. 241). During the program, his instructor noted that A.C.C. cried when he did not get his way and talked about "blood and guts and people being killed." (Tr. 241). In kindergarten, during the 2002-03 school year, A.C.C. was disciplined for throwing food in the lunchroom, throwing rocks at other students, hitting another student with a backpack, not sitting down or staying in his seat, using obscene gestures, making rude comments, throwing fits, calling other children names, and being generally disobedient. (Tr. 243-50). In his nine weeks progress report, A.C.C.'s teacher stated that he is "usually loud when wanting his agenda tended to. Threw a fit the other day." (Tr. 250). However, A.C.C.'s final kindergarten progress report stated that he had "improved so much. He is really wanting to do good work and to be good. He does worry and seem out of sorts if everything is not just right. I have enjoyed him. He is a sweet little boy." (Tr. 249).

In second grade, A.C.C. was disciplined for biting off another child's food and failing to follow instructions. (Tr. 251). His teacher noted that A.C.C. was "an intelligent, cute kid in my second grade class. However, he has to be constantly reminded to be still, sit properly in his seat, and follow class rules. He has incredible potential." (Tr. 253). On the Otis-Lennon School Ability Test ("OLSAT"), A.C.C. scored above average in nonverbal reasoning, specifically pictorial and figural reasoning. (Tr. 271). A.C.C. received average scores in verbal comprehension and below average in verbal reasoning. (Tr. 271).

3

In third grade, A.C.C. took the Arkansas Benchmark Examination. (Tr. 270). His composite score ranked in the 61st percentile and was on par with national averages. (Tr. 270).

In fourth grade, A.C.C. was disciplined for stealing a hat from a store and biting another student. (Tr. 269). On his report card, A.C.C. received Cs and Ds in math, Cs in reading, Bs in language, spelling, and social studies, As and Bs in science, and satisfactory marks in art, music, physical education, and citizenship. (Tr. 266). On the Arkansas Benchmark Examination for Mathematics and Literacy, A.C.C. demonstrated proficiency in literacy and a basic understanding of math. (Tr. 267).

In fifth grade, A.C.C.'s teacher, Ms. Curtis, completed a teacher questionnaire concerning A.C.C.'s overall functioning. (Tr. 258-65). Ms. Curtis indicated that A.C.C. had no difficulty in acquiring and using information, attending and completing tasks, moving about and manipulating objects, and health and physical well-being. (Tr. 258-65). Ms. Curtis found that A.C.C. had slight difficulty interacting and relating with others. (Tr. 261). She observed a slight problem making and keeping friends, seeking attention appropriately, expressing anger appropriately, asking permission appropriately, and introducing and maintaining relevant and appropriate topics of conversation. (Tr. 261). Ms. Curtis also observed that A.C.C. had problems caring for himself. She noted a slight problem handling frustration appropriately, being patient when necessary, and responding appropriately to changes in own mood (e.g., calming self). (Tr. 263). Regarding A.C.C.'s functioning, Ms. Curtis stated, "I have observed emotional problems with [A.C.C.]. He calms down if touched on the shoulder and talked to soothingly and assured that nothing will happen to him (family situation)." (Tr. 263).

AO72A
(Rev. 8/82)

## II. Medical Records

### A. UAMS Department of Pediatrics

On September 25, 2002, A.C.C. underwent screening to determine the presence of learning disabilities, language deficits, or emotional/behavioral problems. (Tr. 274). On the Woodcock-Johnson Achievement Test, A.C.C. scored in the average range for his age group in reading, spelling, and math, while he scored high average to superior in writing. (Tr. 275-79). A.C.C.'s testing revealed behavioral difficulties, resulting in a diagnosis of ODD. (Tr. 279). A.C.C.'s ODD is "characterized by poor anger management, argumentativeness, defiance of authority, aggravation of others, externalization of blame, vindictiveness, and being easily annoyed." (Tr. 279). Additionally, testing revealed that A.C.C. was at risk for ADHD, combined type. (Tr. 279).

### B. Ozark Counseling Services

A.C.C. began treatment at Ozark Counseling Services at age four. (Tr. 392). At his initial intake evaluation, on April 17, 2002, A.C.C.'s therapist noted that he was having problems "adjusting to his parents' divorce, remarriage, and current pregnancy." (Tr. 392). A.C.C. was exhibiting behavioral problems, including sexual acting out, mood swings, temper tantrums, short attention span, and noncompliance. (Tr. 392). A.C.C. was diagnosed with Adjustment Disorder and sexual abuse of a child (victim) stemming from his "chaotic home environment." (Tr. 393). A.C.C.'s therapist noted that A.C.C. "is very verbal and intelligent," but is experiencing behavioral problems both at home and at school. (Tr. 393).

Dr. Collins, in a psychiatric evaluation dated March 14, 2003, stated:

[A.C.C.] has been hyperactive all of his life . . .He 'flashed' a girl and used foul language. This year, he has already been suspended from kindergarten twice for throwing rocks at other students and for throwing food. Recently, he attempted

to drive the school bus. He is frequently in trouble both at school and at home for misbehavior. He is very distractable [sic] and has a short attention span. He has threatened to smother his baby brother. His mother keeps a constant eye upon him at home. She has great concern that he is either going to seriously harm himself or someone else.

(Tr. 385). Based on these assessments, Dr. Collins diagnosed A.C.C. with ADHD, combined type, and ODD. (Tr. 386).

Over the course of his treatment at Ozark Counseling, A.C.C. took several medications, including Strattera and Concerta[4], which had mixed success. In his progress notes dated May 12, 2003, Dr. Collins noted that A.C.C. was "doing considerably better on the Concerta. He is calmer most of the time . . . the school has noted a considerable improvement, as well." (Tr. 384). On August 12, 2003, however, Dr. Collins noted that "Concerta seemed to lose a lot of its effectiveness. [A.C.C.] has been more hyperactive and has been acting out a great deal. He has been aggressive toward his siblings and destructive of property. He even defecated on the closet floor." (Tr. 300). One month later, on September 5, 2003, Dr. Collins noted that A.C.C. "has had only one temper tantrum at school and otherwise appears to be doing well there. He is also doing better behaviorally at home." (Tr. 297). Similarly, on December 2, 2003, Dr. Collins stated that A.C.C. "has continued to bring up his grades substantially and has had his name on the board only twice this year. Last year when unmedicated he was in trouble all the time." (Tr. 295).

On January 29, 2004, Dr. John Walters' notes reveal that A.C.C. had experienced a resurgence of behavioral problems. "Concerta seems to be losing its effectiveness. He has been getting into trouble more the past two months." (Tr. 294). As a result, Dr. Walters prescribed

---

[4] Concerta is indicated for the treatment of ADHD. Physicians' Desk Reference (PDR), 2598 (64th ed. 2010).

6

Adderall. (Tr. 294). On March 12, 2004, Dr. Walters' notes state that A.C.C. "has done poorly since his last visit . . . he is frequently in trouble." (Tr. 292, 376). After adjusting A.C.C.'s dosage, Dr. Walters noted, on April 29, 2004, that A.C.C. was "making all A's" and not getting into trouble at school anymore. (Tr. 291). A.C.C. was "calm, cooperative, pleasant, nonpsychotic, and non-suicidal." (Tr. 291).

C. Rivendell Behavioral Health Services

A.C.C. was admitted to Rivendell from August 12, 2004- August 25, 2004, due to escalating behavioral problems. (Tr. 282). In his discharge report, Dr. Diner noted:

> Patient does have a long history in the past 2-3 years of dangerous and impulsive episodes which threaten his health and safety. Patient has acted out in school, on the bus, putting bus in gear and having exhibited cruel acts towards animals. Patient has reported to have been sexually abuse [sic] by his biological father. . . Patient does frequently talk about episodes of cutting himself and others and in the past has attempted to open bottles of medication. In 2001 patient attempted to smother his then infant sibling and had his hands around the baby's throat. Patient snuck out of the bathroom while at the baby sitter's house a few days prior to admission and has reportedly threatened to kill his adoptive brother in the home and has also sexually targeted him. Patient has attempted to drown the family pet and does admit to feelings of hopelessness, worthlessness, and low self-esteem.

(Tr. 282). Following his evaluation, Dr. Diner diagnosed A.C.C. with Impulse Control Disorder not otherwise specified, in addition to ADHD, ODD, and sexual abuse as a child. (Tr. 283). A.C.C. was prescribed Zoloft for depression, Adderall for his poor impulse control, and Clonidine to stabilize his mood. (Tr. 283). During his stay, A.C.C. "did have a difficult time expressing himself and getting his needs met appropriately and continued to blame others and had a difficult time taking responsibility for his own negative behaviors." (Tr. 283). Upon discharge, A.C.C. was felt to have stabilized and could be treated in a less restrictive environment. (Tr. 283).

7

### D. Dr. Stephen Dollins

A.C.C.'s primary care physician referred him to Dr. Stephen Dollins. On November 9, 2004, Dr. Dollins stated that A.C.C. had "problems with depression and anxiety. His behavior has been worse at home since having contact with his father . . . has been lying, cruel to pets, defiant toward mother. . . lot of negative behaviors." (Tr. 334). On January 24, 2005, Dr. Dollins opined that A.C.C. was still having "problems with his temper." (Tr. 333).

### E. Dr. Stephen Harris

On May 4, 2005, A.C.C. was evaluated by Dr. Harris. (Tr. 316-20). Dr. Harris found that A.C.C. had an IQ of 80 or greater and a Global Assessment of Functioning (GAF) of 53.[5] (Tr. 318-19). Dr. Harris also concluded that A.C.C.'s adaptive functioning was lower than his intellectual abilities. (Tr. 319). Following evaluation, A.C.C. was diagnosed with ADHD, ODD, and Intermittent Explosive Disorder.[6]

### F. DDS Evaluations

In a report dated November 3, 2004, Dr. Frazier Kennedy found that although A.C.C. suffered from ADHD and ODD, which were severe impairments under the Act, they did not meet, medically equal, or functionally equal a listing (Tr. 300-03). Dr. Kennedy found that A.C.C. had marked limitation in attending and completing tasks and less than marked limitation in interacting and relating with others. (Tr. 303). Dr. Kennedy found no limitations in acquiring and using information, moving about and manipulating objects, caring for one's self, and health and physical

---

[5] A GAF of 53 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, *supra* note 1, at 34.

[6] Intermittent Explosive Disorder is characterized by "the occurrence of discrete episodes of failure to resist aggressive impulses that result in serious assaultive acts or destruction of property." *Id.* at 663.

AO72A
(Rev. 8/82)

well-being. (Tr. 303-04). As Dr. Kennedy did not find extreme limitation in one domain of functioning or marked limitation in two or more domains, he concluded that A.C.C.'s impairments did not functionally equal a listing. 20 C.F.R. § 416.926a(a). In explanation, Dr. Kennedy noted that A.C.C.'s behavior had improved with medication and psychotherapy. (Tr. 303).

A.C.C. was re-evaluated on May 25, 2005, by Dr. T. Smith. (Tr. 307-13). Dr. Smith found that A.C.C. suffered from ADHD, ODD, and Intermittent Explosive Disorder, which constituted severe impairments, but which did not meet, medically equal, or functionally equal a listing. (Tr. 307). Dr Smith found no limitations in acquiring and using information, moving about and manipulating objects, caring for one's self, and health and physical well-being, and less than marked limitations in attending and completing tasks and interacting and relating with others. (Tr. 309). In explaining his findings, Dr. Smith stated that A.C.C.'s behavior at school had improved with medication. (Tr. 309).

G. Dr. Robert Ahrens

Dr. Ahrens is A.C.C.'s primary care physician. He saw A.C.C. numerous times throughout childhood for various physical ailments.

Dr. Ahrens' Evaluation, dated November 15, 2006, indicated that A.C.C. met some, but not all,[7] of the criteria for the mental impairment listings of: 112.02 (organic mental disorder), manifested by disturbance in personality and mood, emotional lability, and impairment of impulse control, causing marked impairment in age-appropriate cognitive/communicative function; 122.04 (mood disorder), manifested by depressed or irritable mood, fatigue or loss of energy, feelings of

---

[7] Upon inspection, the report dated November 15, 2006, indicates that A.C.C.'s impairments do not meet all the criteria of any listing. This point is more fully discussed later in this opinion.

AO72A
(Rev. 8/82)

worthlessness or guilt, suicidal thoughts or acts, and easy distractibility; 12.08 (personality disorder), manifested by persistent disturbances of mood or affect, pathological dependence, passivity, or aggressiveness, or intense and unstable interpersonal relationships and impulsive and exploitative behavior; and 112.11 (ADHD), manifested by marked inattention, impulsiveness, and hyperactivity.[8] (Tr. 196-205, 323-332).

H. <u>Arkansas Counseling Associates</u>

A.C.C. began treatment with Arkansas Counseling Associates in 2007. On March 30, 2007, Dr. Winslow's notes state that A.C.C. was "having problems staying in [his] seat, refusing to do homework (by lying to mother), grades have been suffering . . .frequently in trouble for talking too much, or making noises." (Tr. 405). Additionally, A.C.C. had "wandered out of [the] house" recently and had stolen candy. (Tr. 405). On April 12, 2007, A.C.C. stated that he was "doing better at school." (Tr. 428). Additionally, his mother stated that she believed there had been "slight improvement" in A.C.C.'s behavior. (Tr. 428). On April 25, 2007, A.C.C. and his physician discussed how he had recently climbed out his window at night and rode his bike around town until picked up by a fireman. (Tr. 429). Additionally, on May 10, 2007, A.C.C. discussed how he had been urinating on his bedroom floor. (Tr. 430).

---

[8] It appears that this form is produced twice in the transcript, once on pages 196-205 and also on pages 323-332. Additionally, the transcript contains a third check-off form completed on March 30, 2007, but it does not indicate who the completing physician was, nor was it signed. (Tr. 398-404). As the court cannot verify who provided the medical opinion in this evaluation, we cannot give it significant weight in our determination.

AO72A
(Rev. 8/82)

I. <u>Morrilton Medical Clinic</u>

On February 13, 2008, A.C.C.'s progress notes reveal that he had "not had any crying episodes and grades are actually very good." (Tr. 8). A.C.C.'s physician noted that A.C.C.'s ADHD and depression were apparently stable and his ODD was under good control. (Tr. 8).

**<u>Applicable Law</u>:**

The court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2003). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support a conclusion." *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)). In determining whether evidence is substantial, the court considers both evidence that detracts from the Commissioner's decision as well as evidence that supports it. *Craig v. Apfel*, 212 F.3d 433, 435-36 (8th Cir. 2000) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). If, after conducting this review, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Secretary's] findings," then the decision must be affirmed. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (quoting *Siemers v. Shalala*, 47 F.3d 299, 301 (8th Cir. 1995)).

To be disabled under the Act, a child must prove that he "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations," and which has lasted or can be expected to last for at least twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i); 20 C.F.R. § 416.906. In determining whether a claimant under the age of eighteen is disabled, the ALJ undertakes a sequential three-step evaluation. *Moore ex rel. Moore v. Barnhart*, 413 F.3d 718 (8th Cir. 2005); 20 C.F.R. § 416.924(a). The ALJ first determines whether the child is engaged in

11

substantial gainful activity.  20 C.F.R. § 416.924(b).  If the child is so engaged, he will not be awarded SSI benefits.  *Id.*  At the second step, the ALJ determines whether the child has an impairment or combination of impairments that is "severe." 20 C.F.R. § 416.924(c).  To be deemed severe, an impairment must be more than "a slight abnormality . . . that causes no more than minimal functional limitations."  *Id.*  At the final step, the ALJ determines whether the child has an impairment or impairments that meet, medically equal, or functionally equal a listed impairment.  20 C.F.R. § 416.924(d).

The claimant has the burden of showing that his impairment meets or equals a listing.  *Jackson v. Astrue*, 314 Fed. Appx. 894, 895 (8th Cir. 2008) (citing *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004)).  To meet a listing, an impairment must meet all the specified criteria.  *Id.*  A child's impairment medically equals a listed impairment if it "is at least equal in severity and duration to the medical criteria of the listed impairment."  20 C.F.R. § 416.926(a); *Neal ex rel. Walker v. Barnhart*, 405 F.3d 685, 689 (8th Cir. 2005).  Even if a child's impairments do not meet a listing, he will be awarded benefits if his impairments "functionally" equal a listed impairment.  20 C.F.R. § 416.926a(a).  To determine whether an impairment functionally equals a disability included in the Listings, the ALJ must assess the child's developmental capacity in six specified domains.  20 C.F.R. § 416.926a(b)(1).  The six domains are:  (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and, (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1); *see also Moore ex rel. Moore v. Barnhart*, 413 F.3d 718, 722 n. 4 (8th Cir. 2005).  To functionally equal a listing, an impairment must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain.  20 C.F.R. § 416.926a(a).

12

A marked limitation is an impairment that seriously interferes with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). It is "more than moderate" but "less than extreme." *Id.* An extreme limitation is defined as "more than marked," and exists when a child's impairment(s) interferes very seriously with his ability to independently initiate, sustain or complete activities. 20 C.F.R. § 416.926a(e)(3)(i). Day-to-day functioning may be very seriously limited when an impairment(s) limits only one activity or when the interactive and cumulative effects of the impairment(s) limit several activities. *Id.*

In determining the degree of limitation in each of the six domains, the ALJ is required to analyze the child's subjective complaints in accordance with the seven factors from 20 C.F.R. § 416.929(c). Specifically, the ALJ must consider these factors: (1) the child's daily activities; (2) the location, duration, frequency, and intensity of the child's pain or other symptoms; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of the child's medication; (5) treatment, other than medication, that the child receives or has received for relief of pain or other symptoms; (6) any measures the child uses or has used to relieve his or her pain or other symptoms; and (7) other factors concerning the child's functional limitations or restrictions due to pain or other symptoms. *See* 20 C.F.R. § 416.929(c)(3); *Polaski v. Heckler,* 739 F.2d 1320 (8th Cir. 1984. The ALJ is not required to methodically discuss each factor as long as the ALJ acknowledges and examines those factors prior to discounting the subjective complaints regarding the child's functional limitations. *See Lowe v. Apfel,* 226 F.3d 969, 971-72 (8th Cir. 2000).

**Discussion:**

Plaintiff contends that the Commissioner's decision is not supported by substantial evidence. Specifically, Plaintiff raises the following issues: (1) whether the ALJ erred at step

AO72A
(Rev. 8/82)

two in determining that A.C.C.'s diagnoses of Intermittent Explosive Disorder, Impulse Control

Disorder, and ODD did not qualify as "severe" under the Act; (2) whether the ALJ properly

determined that A.C.C.'s impairments did not meet or medically equal a listed impairment; (3)

whether the ALJ properly determined that A.C.C.'s impairments did not functionally equal a

listed impairment; (4) whether the ALJ gave proper weight to the opinion of A.C.C.'s treating

physician; and (5) whether the ALJ fully and fairly developed the record.

## I. A.C.C.'s Severe Impairments

The ALJ found that A.C.C. suffers from the following "severe" impairments: ADHD and

Conduct Disorder. (Tr. 27). Plaintiff contends that A.C.C.'s additional diagnoses of ODD,

Impulse Control Disorder, and Intermittent Explosive Disorder should have been deemed

"severe" under the Act.[9] *See* Pl.'s Br. at 14-19.

To be deemed severe, an impairment must be more than "a slight abnormality . . . that

causes no more than minimal functional limitations." 20 C.F.R. § 416.924(c). The court finds

that substantial evidence supports the ALJ's determination that A.C.C. suffers from ADHD and

Conduct Disorder, both of which constitute severe impairments under the Act. Additionally, the

ALJ specifically acknowledged A.C.C.'s other diagnoses in her thorough review of his medical

history. (Tr. 27-31). For this reason, the court finds that the ALJ did not err in her determination

regarding A.C.C.'s severe impairments.

---

[9] In her brief, Plaintiff states, "Yet in spite of the ruling and the *de minimus* standard established by law, the ALJ ruled that chronic pain, fibromyalgia, scoliosis, sleep disturbance, anxiety, cognitive dysfunction, organic brain syndrome to the extent that she was only given a GAF of 45 was not 'severe.'" *See* Pl.'s Br. at 16. As there is no evidence that A.C.C. has any of the aforementioned impairments, the court rejects this argument.

14

## II.  Medical Equivalency

Plaintiff first argues that the ALJ erred in determining that A.C.C's impairments do not meet or medically equal a listing.  *See* Pl.'s Br. at 8-9.  In finding that A.C.C.'s impairments do not meet or medically equal a listing, the ALJ stated:

> The claimant's impairment(s), either singly or in combination thereof, are not of such severity as to meet or medically equal a listed impairment and thus, render him disabled.  Listed impairments related to the mental disorders section (found in section 112.00) were considered in making this determination.

(Tr. 31).[10]  The ALJ's determination is supported by substantial evidence, as Plaintiff failed to carry her burden of proving that A.C.C.'s impairments meet or medically equal a listing.  Specifically, Plaintiff failed to put forth evidence that Plaintiff meets a particular listing under the broad category of mental disorders, instead hinging her argument on the check-off form completed by Dr. Ahrens.  *See* Pl.'s Br. at 9-12.  For reasons stated below, Dr. Ahrens' report does not demonstrate that A.C.C.'s impairments rise to the level of any listing.

## III.  Functional Equivalency

Alternatively, Plaintiff argues that A.C.C.'s impairments functionally equal a listing.  *See* Pl.'s Br. at 9.  The ALJ concluded that A.C.C.'s impairments do not functionally equal a listed impairment, as she found no limitations in acquiring and using information, moving about and manipulating objects, and caring for one's self, and less than marked limitations in attending and completing tasks, interacting and relating with others, and health and physical well-being.  (Tr. 33-37).  In evaluating A.C.C.'s limitations in each of the six domains, the ALJ considered the

---

[10]  The court acknowledges Plaintiff's argument that the ALJ did not consider all of A.C.C.'s impairments in combination.  However, the court finds that the ALJ specifically addressed all of A.C.C.'s impairments in her lengthy and thorough analysis.  (Tr. 27-31).

15

claimant's symptoms in accordance with 20 C.F.R. § 416.929(c), ultimately concluding that although A.C.C. suffered from medically determinable impairments that could reasonably be expected to produce the alleged symptoms, the statements made concerning the intensity, persistence and limiting effects of the claimant's symptoms were not entirely credible. (Tr. 32).

### A. Acquiring and Using Information

This domain considers how well a claimant acquires or learns information, and how well he uses the information learned. 20 C.F.R. § 416.926a(g). Based on A.C.C.'s satisfactory progress in school, his school records, and his functioning levels as indicated by the Arkansas Benchmark Examinations dated April 2006, the ALJ concluded that A.C.C. has no limitations in this domain. (Tr. 33).

As indicated by the ALJ, A.C.C. demonstrated proficiency in literacy and a basic understanding of math on the Arkansas Benchmark Examination. (Tr. 267). Furthermore, A.C.C.'s grades ranged from average to above average in all subjects, indicating that he is very capable of learning and retaining information. (Tr. 266). A.C.C.'s fifth grade teacher, Ms. Curtis, found that A.C.C. had no trouble acquiring and using information. (Tr. 258-65). For these reasons, the ALJ properly determined that A.C.C. has no limitations in this domain of functioning.

### B. Attending and Completing Tasks

This domain considers how well a child is able to focus and maintain attention, and how well he is able to begin, carry through, and finish activities, including the pace at which he performs activities and the ease of changing activities. 20 C.F.R. 416.926a(h). The ALJ found that A.C.C. has less than marked limitations in attending and completing tasks. (Tr. 34).

16

Specifically, she found that although A.C.C. has some difficulty in this domain, his medication and counseling have contributed to significant improvement in his symptoms. (Tr. 34).

A.C.C. was in trouble throughout kindergarten for throwing food in the lunchroom, throwing rocks at other students, hitting another student with a backpack, not sitting down or staying in his seat, using obscene gestures, making rude comments, throwing fits, calling other children names, and being generally disobedient. (Tr. 243-50). However, A.C.C.'s final kindergarten progress report stated that he had "improved so much. He is really wanting to do good work and to be good." (Tr. 249). In second grade, A.C.C.'s teacher noted that he had trouble staying still, sitting properly in his seat, and following class rules. (Tr. 253). However, she noted that A.C.C. had "incredible potential." (Tr. 253). Finally, in fifth grade, Ms. Curtis indicated in her questionnaire that A.C.C. had no trouble attending and completing tasks. For these reasons, the court concludes that substantial evidence supports the ALJ's determination that A.C.C. has less than marked limitations in this domain of functioning.

### C. Interacting and Relating with Others

In assessing a claimant's limitations in the domain of interacting and relating with others, the ALJ considers how well the child initiates and sustains emotional connections with others, develops and uses the language of the community, cooperates with others, complies with rules, responses to criticism, and respects and takes care of the possessions of others. 20 C.F.R. § 416.926a(i); *Garrett ex rel. Moore v. Barnhart*, 366 F.3d 643, 654 (8th Cir. 2004). With regard to this domain of functioning, the ALJ found that although A.C.C. initially had difficulty in kindergarten, he was promoted to the first grade. (Tr. 35). She also noted that A.C.C.'s behavior

17

gradually improved over the course of his elementary school career. (Tr. 35). Accordingly, the

ALJ found that A.C.C. has less than marked limitations in interacting and relating with others.

In kindergarten, A.C.C. was repeatedly disciplined for throwing rocks or food at other

students. (Tr. 243-50). Following kindergarten, however, A.C.C. was disciplined only twice for

negatively interacting with other students, once for biting off another child's muffin and another

time for biting a student. (Tr. 251, 269). A.C.C.'s fifth grade teacher indicated that he did have

slight problems making and keeping friends, seeking attention appropriately, expressing anger

appropriately, asking permission appropriately, and introducing and maintaining relevant and

appropriate topics of conversation. (Tr. 261). However, on a scale of one to five, Ms. Curtis

rated A.C.C.'s behavior at a two, indicating only a "slight" problem. (Tr. 261). The court finds

that the observations of A.C.C.'s fifth grade teacher, who had the ability to observe A.C.C.'s

behavior on a daily basis, in combination with the lessening number of disciplinary incidents as

A.C.C. continued his elementary school career, is highly persuasive evidence of his overall

improvement in this area of functioning. For these reasons, the court finds that substantial

evidence supports the ALJ's determination that A.C.C. has less than marked limitations in the

domain of interacting and relating with others.

D. <u>Moving About and Manipulating Objects</u>

This domain considers how well a child is able to move his body from one place to

another and how a child moves and manipulates objects. 20 C.F.R. § 416.926a(j). The ALJ

found that A.C.C. has no limitations in moving about and manipulating objects. (Tr. 36). There

is no evidence in the transcript to support a finding that A.C.C. has any difficulty in this area of

AO72A
(Rev. 8/82)

functioning. Accordingly, the court finds that substantial evidence supports the ALJ's determination that A.C.C. has no limitations in this domain.

### E. Caring for Yourself

This domain considers how well a child maintains a healthy emotional and physical state, including how well a child satisfies his physical and emotional wants and needs in appropriate ways, how well the child copes with stress and changes in the environment, and whether the child takes care of his own health, possessions, and living area. 20 C.F.R. § 416.926a(k). The ALJ found that A.C.C. has no limitations in this domain of functioning, as he is able to take care of his own personal needs and the evidence does not support a finding to the contrary. (Tr. 37). For these reasons, the court concludes that substantial evidence supports the ALJ's determination that A.C.C. has no limitations in caring for himself.

### F. Health and Physical Well-Being

This domain considers the cumulative physical effects of physical and mental impairments and any associated treatments or therapies on a child's functioning that were not considered in the evaluation of the child's ability to move about and manipulate objects. 20 C.F.R. 416.929a(l). The ALJ found that A.C.C. has less than marked limitations in health and physical well-being. (Tr. 37). To support her conclusion, the ALJ noted that with medication and therapy, the claimant's grades and behavior significantly improved. (Tr. 37).

After reviewing the transcript, the court finds that substantial evidence supports the ALJ's determination that A.C.C. has less than marked limitations in the domain of health and well-being. Although A.C.C. had significant behavioral problems in kindergarten, his overall behavior improved significantly with treatment and medication. A.C.C. experienced occasional

19

bouts of regression, generally when a particular medication lost effectiveness. (Tr. 294, 300, 383). However, with changes in medication and dosage, A.C.C.'s behavior and grades continued to improve. (Tr. 8, 258-65, 266-67, 291, 295-97, 428). For these reasons, the court concludes that the ALJ properly determined that A.C.C. has less than marked limitations in this area of functioning.

## IV. Treating Physician's Opinion

Plaintiff's next argues that the ALJ failed to give proper weight to the report completed by Dr. Ahrens on November 15, 2006. *See* Pl.'s Br. at 9-12. A treating physician's opinion is given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in a clamant's record. *Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009); 20 C.F.R. § 404.1527(d)(2). The record must be evaluated as a whole to determine whether the treating physician's opinion should be controlling. *Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005). A treating physician's evaluation may be disregarded where other medical assessments "are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Id.* at 920-21 (quoting *Prosch*, 201 F.3d at 1013). In any case, an ALJ must always "give good reasons" for the weight afforded to the treating physician's opinion. 20 C.F.R. § 404.1527(d)(2).

The ALJ gave little weight to the report completed by Dr. Ahrens, stating that his findings were inconsistent with the medical evidence as a whole. (Tr. 37). Dr. Ahrens' report, completed on November 15, 2006, was essentially a check-off form of the mental listings. *See Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001) ("the checklist format, generality, and

incompleteness of the assessments limit their evidentiary value"). At the beginning of his report, Dr. Ahrens stated, "this child is a patient of mine. It is my opinion, stated within a reasonable degree of medical certainty, that he meets or exceeds the Listing 112.00 Mental Disorders." (Tr. 323). However, upon close inspection, Dr. Ahrens' checkmarks indicate that A.C.C. meets some, but not all, of the requirements of any listing. Specifically, Dr. Ahrens found that A.C.C. did not meet the "B" criteria for the listings of 112.02 (organic mental disorder), 112.04 (mood disorder), 112.08 (personality disorder), and 112.11 (ADHD). (Tr.196-205, 323-332).

Additionally, Dr. Ahrens provided no explanation for his findings. 20 C.F.R. § 416.927(d)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion."). The courts finds that Dr. Ahrens' report is both ambiguous and inconsistent with his own statements as well as the evidence as a whole. Accordingly, we find that the ALJ gave proper weight to Dr. Ahrens' opinion.

## V. Development of the Record

In her final point, Plaintiff argues that the ALJ failed to fully and fairly develop the record. Specifically, Plaintiff argues that the ALJ failed to send A.C.C. for additional mental evaluations, which would have been essential to her determination, instead choosing to play "amateur doctor." *See* Pl.'s Br. at 17. The Court rejects this argument. There is no indication that the ALJ was unable to make a determination based on the evidence supplied to her. *See Tellez v. Barnhart*, 403 F.3d 953, 956-57 (8th Cir. 2005). Furthermore, Plaintiff's argument on this point is vague and conclusory, and discusses impairments unrelated to A.C.C.'s case. For these reasons, the court finds that the ALJ satisfied her duty to fully and fairly develop the record.

21

**Conclusion:**

Based on the forgoing, we find there is substantial evidence to support the ALJ's determinations at all three steps of the sequential analysis. Accordingly, we conclude there is substantial evidence supporting the ALJ's determination that A.C.C.'s impairments do not meet, medically equal, or functionally equal any listed impairment.

DATED this <u>12th</u> day of January 2010.

/s/ *J. Marschewski*
HONORABLE JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)